UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| BOSS PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:05-CV-293 RM |
| | ) | |
| PORT-A-PIT BAR-B-QUE OF | ) | |
| EDGERTON, INC., | ) | |
| | ) | |
| Defendant | ) | |

OPINION and ORDER

This case comes before the court on the motion of Port-A-Pit Bar-B-Que of

Edgerton, Inc. ("Edgerton") for summary judgment on the claims of Boss Products,

Inc., which include breach of contract (Count 1), trademark infringement in

violation of 15 U.S.C. § 1114 (Count 2), unfair competition in violation of 15

U.S.C. § 1125 (Count 3), and trademark dilution (Count 4) in violation of 15

U.S.C. § 1125(e). Edgerton has styled its motion as one for "partial" summary

judgment because the company doesn't seek judgment on its counterclaim against

Boss Products. Following a review of the parties' submissions, the court concludes

that Edgerton's motion should be granted in part and denied in part.

Summary judgment is appropriate when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In

deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## I. FACTS

The events relevant to the parties' claims began in the early 1970's when Robert Peverly met Nelson Gongwer and was introduced to Mr. Gongwer's "Cater-Car" grill. The two men entered into business arrangement and signed their first contract on March 9, 1974, which permitted Mr. Peverly to provide catering services using a Cater-Car grill leased from Mr. Gongwer's company, Port-A-Pit Bar-B-Que, Inc., an Indiana corporation located in Elkhart, Indiana.[1]

The introductory paragraphs to the 1974 Agreement state that Nelson's, as the exclusive U.S. distributor for the "Cater-Car" barbeque grill and pursuant to patent rights granted by Nelson Gongwer, agreed "to work out an arrangement for the use of its barbeque machine by [Edgerton] so long as [Edgerton] does it as an individual proprietor." As part of the agreement, Edgerton was required to pay Nelson's one-half of its net profits, take all necessary steps to do business as a sole proprietorship under an assumed name, and pay for and use all barbeque

---

[1] According to the parties' submissions, Boss Products is the corporate name of the company formerly known as "Port-A-Pit Bar-B-Que, Inc." and/or "Port-A-Pit by Nelson's Golden Glow." For clarity, the court refers to the plaintiff as "Nelson's" in discussions relating to the parties' dealings before the termination of their relationship in October 2003; the court refers to the plaintiff as "Boss Products" in connection with the claims of the complaint and arguments in the summary judgment response.

sauces developed by Nelson's. The term of the 1974 agreement was one year. The document was signed by Dean Gongwer (Nelson Gonger's son) on behalf of Nelson's, and Robert T. Peverly, on behalf of Edgerton, and was witnessed by Nelson Gongwer. A second one-year agreement was signed on July 8, 1975. The terms of the 1974 and 1975 agreements are identical, except that the 1975 agreement expanded Edgerton's territory of operation and cancelled Edgerton's option to purchase a Cater-Car grill.

In July 1981, Mr. Peverly incorporated his business in Ohio under the name "Port-A-Pit Bar-B-Que of Edgerton, Inc." Mr. Peverly maintains no one from Nelson's objected to his choice of the name for his business.

The parties continued their dealings under the terms of the 1974/1975 agreements until November 1, 1983 when they entered into a Lease Agreement that included a five year term, expanded the number of leased grills and Edgerton's territory of operation, changed the payment terms, added a requirement that Edgerton not copy or duplicate the leased grill "either directly or indirectly" or aid anyone else in copying the grill, and removed the requirement that Nelson's barbeque sauces be used ("Although [Nelson's] highly recommends the use of such sauces, there is no obligation on the part of [Edgerton] to use same."). An Addendum to the l983 Lease Agreement expanded Edgerton's territory. The 1983 Lease Agreement and Addendum were both signed by Dean Gongwer, President of Nelson's (as Lessor) and Robert Peverly, President of Edgerton (as Lessee).

In 1987, the parties entered into a second lease agreement that contained terms and signatories identical to those in the 1983 agreement except the 1987 agreement included a three year lease term, added a grill and an additional Ohio county to Edgerton's territory, and changed the payment terms for the grills. The parties' relationship continued under the terms of the 1987 lease agreement until 2003 when Edgerton says Boss Products proposed new contracts containing unreasonable terms. Edgerton decided to not renew the lease and, instead, returned the seven Cater-Car grills to Boss Products. Before returning the grills, though, Robert Peverly took one of the grills to a manufacturing business and asked that a grill be built for him. Mr. Peverly says he wanted the fabricator to examine the Cater-Car grill to better understand the changes he wanted on the new grill. According to Mr. Peverly, the new grill contains several differences from the Cater-Car grill that affect not only the appearance of the grill, but its functionality, as well.

In October 2003, Boss Products sent a cease and desist letter to Edgerton advising that Edgerton could no longer use the Port-A-Pit name.[2] Boss Products claims Edgerton continued to use the mark after that time, so the company filed suit in 2005 alleging Edgerton's use of the Port-A-Pit name after 2003 constitutes trademark infringement and dilution and unfair competition and Edgerton's acquisition of a new grill constitutes a breach of contract. Boss Products seeks to

---

[2] In October 2003, Nelson Gongwer's grandson, Troy Gongwer, controlled Boss Products, and Robert Peverly's son, Daniel Peverly, controlled Edgerton.

have Edgerton permanently enjoined from using the Port-A-Pit mark, destruction of any Edgerton products bearing the mark, monetary damages (including Edgerton's profits, actual damages, and treble damages), interest, attorney fees, and costs.

## II. TRADEMARK CLAIMS

Boss Products alleges that Edgerton's use of the business name "Peverly's Port-A-Pit Bar-B-Que, Inc." infringes Boss Products' registered "Port-A-Pit" trademark[3] and amounts to unfair competition and trademark dilution. Boss Products says its mark was registered and first used in commerce on or about June 21, 1973, the company has continued to use the mark since that time, and the mark has "achieved widespread and favorable public acceptance, recognition, and fame."

Edgerton seeks summary judgment motion on Boss Products' trademark claims, arguing that Boss Products isn't entitled to relief on those claims. Edgerton first disputes Boss Products' claim that the parties had an agreement relating to use of the "Port-A-Pit" trademark. Edgerton next asserts that Boss Products abandoned its mark via naked licensing. Edgerton lastly maintains that Boss Products inexcusably delayed enforcement of its trademark rights, resulting

---

[3] Boss Products' "Port-A-Pit" service mark was first registered on August 6, 1974, and its "Port-A-Pit" trademark was registered on September 21, 2004.

in its right of recovery being barred under the doctrines of laches and/or acquiescence. Edgerton's arguments are addressed separately below.

## A. Contract Terms

Indiana law, which governs the contracts between Nelson's and Edgerton,[4] requires the court to "accept an interpretation of the contract that harmonizes its provisions as opposed to one that causes the provisions to be conflicting." Bank of America, N.A. v. Ping, 879 N.E.2d 665, 669 (Ind. Ct. App. 2008). The court must "presume that all provisions included in a contract are there for a purpose," City of Lawrenceburg v. Milestone Contractors, L.P., 809 N.E.2d 879, 883 (Ind. Ct. App. 2004), and strive to avoid an interpretation that would "render any words, phrases, or terms ineffective or meaningless." Village Commons, LLC v. Marion County Prosecutor's Office, 882 N.E.2d 210, 215 (Ind. Ct. App. 2008).

The parties haven't challenged any of the contracts' written terms; they disagree about the existence and/or terms of an oral agreement Boss Products claims governed use of its "Port-A-Pit" trademark. Boss Products says Nelson Gongwer and Robert Peverly orally agreed in 1974 that Mr. Peverly could use the "Port-A-Pit" name in his business as long as he used the Cater-Car grill and Nelson's sauces. Boss Products claims those oral terms applied to the 1983 and 1987 lease agreements, as well. Edgerton insists the parties had no agreement,

---

[4] See 1974 & 1975 Agreements, ¶ 10 ["This Agreement shall be interpreted under the laws of the State of Indiana."]; 1983 & 1987 Lease Agreements, ¶ 22 ["This agreement and the rights of the parties hereunder shall be governed by the laws of the State of Indiana."].

written or oral, relating to use of the Port-A-Pit name. Edgerton maintains that under the terms of the parties' various agreements – which, Edgerton notes, were all drafted by Nelson's – Edgerton was required to adopt an assumed business name, a requirement that didn't address the "Port-A-Pit" mark or include any restrictions on what name Edgerton could choose or use.

While Boss Products and Edgerton each set forth extrinsic evidence that Boss Products says establishes and Edgerton says refutes the existence of an oral agreement, "where parties have reduced an agreement to writing and have stated in an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering extrinsic evidence for the purpose of varying or adding to the terms of the written contract." American's Directories, Inc. v. Stellhorn One Hour Photo, Inc., 833 N.E.2d 1059, 1066 (Ind. Ct. App. 2005); *see also* Sees v. Bank One, Indiana, N.A., 839 N.E.2d 154, 161 (Ind. 2005) (a party is generally "excluded from presenting extrinsic evidence of prior or contemporaneous oral agreements offered to vary or contradict the terms of a written contract"). The parties' agreements contain the following integration clauses:

> 1974 & 1975 Agreements: "WHEREAS, the parties wish to reduce the terms of their agreement to writing; NOW THEREFORE, in consideration of the premises and mutual covenants and promises of the parties hereinafter contained, it is agreed as follows: . . . " [p. 1]
> 1983 & 1987 Lease Agreements: "This Lease Agreement contains the entire agreement of the parties hereto and no representations, inducements, promises, or agreements, oral or

otherwise, not embodied herein or attached hereto unless of subsequent date, shall be of any force and effect." [p. 9, ¶ 22]

Provisions in the 1974 and 1975 agreements required Edgerton to operate as a sole proprietor under an assumed business name and use Nelson's barbeque sauces, and provided that the contracts could be terminated if Edgerton failed "to use [Nelson's] recommended barbeque sauces and . . . to comply with [Nelson's] instructions for the proper use and maintenance of the Cater-Car and its accessories". Under the terms of the 1983 and 1987 lease agreements, Edgerton was required to operate "as an independent business in all respects" with "sole control" over the manner in which it used the leased grill and operated its business; had no obligation to use the barbeque sauces; and could be deemed to be in default by neglecting or failing to perform any of the leases' covenants, conditions, and agreements. None of the agreements referenced any trademark rights, restricted Edgerton's use of the "Port-A-Pit" name, or tied Edgerton's use of the "Port-A-Pit" name to rental of the grill and use of Nelson's sauces. Thus, Boss Products' claim that an oral agreement governed the parties' agreements and conditioned Edgerton's use of the "Port-A-Pit" trademark on use of the Cater-Car grill and Nelson's sauces is inconsistent with the 1974/75 agreements and contrary to the written terms of the 1983/85 agreements.

"[T]he parol evidence rule prohibits courts from considering extrinsic evidence for the purpose of varying or adding to the terms of the written contract," although parol evidence may be considered "to show that fraud, intentional

misrepresentation, or mistake entered into the formation of a contract." America's Directories Inc., Inc. v. Stellhorn One Hour Photo, Inc., 833 N.E.2d 1059, 1066 (Ind. Ct. App. 2005). The clear language of the agreements' integration clauses states that the written documents contain the entirety of the parties' agreements, and neither party has alleged fraud, misrepresentation, or mistake in the formation of the contracts, so evidence of an oral agreement must be excluded. *See* Jamrosz v. Resource Benefits, Inc., 839 N.E.2d 746, 755 (Ind. Ct. App. 2005) ("evidence, parol or otherwise, extrinsic to the written provisions of a contract will not be admitted for the purpose of varying or adding to that writing when it appears that both parties intended a complete integration of that contract in the written terms"); *see also* Rothe v. Revco D.S., Inc., 148 F.3d 672, 675 (7th Cir. 1998) ("an omitted contract term does not move Indiana courts to supply one").

Neither party has alleged that any of the contracts' terms are ambiguous, and review of the agreements reveals no ambiguities. Given the contracts' clear and unambiguous language, the court will "only require performance that is consistent with [those] terms." Rothe v. Revco D.S., Inc., 148 F.3d 672, 674 (7th Cir. 1998) (applying Indiana law); *see also* Bank of America, N.A. v. Ping, 879 N.E.2d 665, 670 (Ind. Ct. App. 2008) ("The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts.").

*B. Affirmative Defenses*

Edgerton next asserts Boss Products is barred from enforcing its trademark rights because Boss Products abandoned its mark via naked licensing and/or inexcusably delayed enforcement of its trademark rights.

## 1. Abandonment/Naked Licensing

Edgerton contends that the parties' contracts amounted to naked licensing and the "Port-A-Pit" mark should be deemed abandoned because Nelson's didn't exercise any control over any trademark rights it claims to assert. Edgerton says the contract language demonstrates Nelson's desire to not control Edgerton's business. In fact, Edgerton says, the 1983/85 Lease Agreements prohibited control by Nelson's: lease terms specify that Edgerton "is an independent business in all respects and is not required to use any particular marketing plan or system"; is to have "sole control over the manner in which [it] will use the leased barbeque machine and over [its] method of operation"; and has "no obligation" to use Nelson's sauces. Edgerton says, too, that Nelson's knew for some period of time – at least since 2000 – that Edgerton wasn't using Nelson's sauce and "[t]here can perhaps be no more significant deviation or abandonment of quality standards for a barbeque trademark owner than giving up the right to mandate a particular sauce." Edgerton concludes that because it was free to market its business the way it saw fit, to serve (in addition to the chicken) any side items it chose, and to use the sauces of its choice, the "Port-A-Pit" trademark should be deemed

abandoned on the basis of naked licensing or, alternatively, deemed abandoned in the specific territory in which Edgerton has operated for many years.

"One method by which a mark may be abandoned is through 'naked licensing,' which occurs '[w]hen a trademark owner fails to exercise reasonable control over the use of a mark by a licensee,' such that 'the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods or services that are under the control of the owner of the mark' and the mark can no longer provide 'a meaningful assurance of quality.'" Tumblebus, Inc. v. Cranmer, 399 F.3d 754, 764 (6th Cir. 2005) (*quoting* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 33 cmt. b (1995)). An owner that licenses a trademark or trade name to a third party "has the duty to control quality." J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:42 (4th ed. 1997). "While some loss of quality control is inevitable when licensing a product, naked licensing results in the owner's abandonment of all trademark rights. . . . [T]hus, a party attempting to establish abandonment via naked licensing faces a heavy burden of proof." Alpha Tau Omega Fraternity, Inc. v. Pure Country, Inc., No. IP 01-1054, 2004 WL 3391781, at *10 (S.D. Ind. Oct. 26, 2004).

Boss Products responds that the Seventh Circuit "advocates a flexible approach" to oversight by licensors, which "allows licensors to rely at least somewhat on the reputation and expertise of licensees." TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir. 1997) (*citing* RESTATEMENT

(THIRD) OF UNFAIR COMPETITION § 33 cmt. c (1995)). In reliance on <u>Bunn-O-Matic</u> <u>Corp. v. Bunn Coffee Serv., Inc.</u>, 88 F. Supp. 2d 914, (C.D. Ill. 2000), Boss Products says that a "significant deviation" of quality standards is needed to support a finding of abandonment, and there is no such evidence here. *See id.* at 927 n.5 ("Absent a significant deviation from the licensor's quality standards, a licensor does not forfeit its trademark rights through licensing agreements." (*quoting* <u>TMT North America, Inc. v. Magic Touch GmbH</u>, 124 F.3d 876, 886 (7th Cir. 1997)). Boss Products says the Peverlys were above average lessees and the parties had a good relationship until 2003 when Edgerton terminated the relationship. Boss Products also says that for most of that time Edgerton's food quality remained unchanged. Boss Products maintains no problems arose until 2000 when Edgerton's consumption of Nelson's sauce began to decline, and Boss Products insisted Edgerton used Boss Products' sauce exclusively. Boss Products maintains there is insufficient evidence of a "significant deviation" of quality standards to support a finding that it abandoned the "Port-A-Pit" mark.

Edgerton says Nelson's abandoned control over the "Port-A-Pit" mark by allowing Edgerton to operate as an independent business and delaying action when it learned that Edgerton wasn't using Nelson's sauces. Edgerton, though, hasn't asserted that it was offering a lower quality of products or services than those contemplated by the parties' agreements, that the sauce(s) it was using constituted a significant deviation from Nelson's "Port-A-Pit" quality standards, or that its actions lessened the significance of the "Port-A-Pit" mark. Edgerton hasn't

alleged or pointed to evidence of sufficient omissions by Nelson's that would support a finding of abandonment under 15 U.S.C. § 1127.[5] *See* <u>Stanfield v. Osborne Indus., Inc.</u>, 52 F.3d 867, 872 (10th Cir. 1995) ("In cases in which courts have found that a licensor justifiably relied on a licensee for quality control, some special relationship existed between the parties."); <u>Taco Cabana Intern., Inc. v. Two Pesos, Inc.</u>, 932 F.2d 1113, 1121 (5th Cir. 1991) ("Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of inspection and control formalities."); <u>Transgo, Inc. v. Ajac Transmission Parts Corp.</u>, 768 F.2d 1001, 1017-1018 (9th Cir. 1985) ("Due to [licensor's] association with [licensee] for over ten years and his respect for his ability and expertise, [licensor] felt he could rely on [licensee] to maintain high standards by performing his own quality control."); <u>United States Jaycees v. Philadelphia Jaycees</u>, 639 F.2d 134, 140 (3d Cir. 1981) (declining to find abandonment on basis of "naked" license where licensee did not offer lower quality of service).

## 2. Acquiescence and Laches

---

[5] "A mark shall be deemed to be 'abandoned' if either of the following occurs: (1) When its use has been discontinued with intent not to resume such use. . . . (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for goods or services on or in connection with which it is used or other to lose its significance as a mark." 15 U.S.C. § 1127.

Edgerton also argues that the equitable principles of acquiescence and laches bar Boss Products' trademark claims because Nelson's/Boss Products failed to assert its trademark rights for over thirty years. Edgerton says it set up its business using the "Port-A-Pit" mark in the early 1970's, registered its business name using the "Port-A-Pit" mark in 1981, and confirmed and reconfirmed its unrestricted use of the "Port-A-Pit" name in contracts with Nelson's in 1974, 1975, 1983, and 1987. Edgerton says Nelson's failed to reference or reserve any trademark rights in any contract and only sought to prevent Edgerton's use of the mark when Edgerton terminated the parties' business relationship in 2003, thirty years after Edgerton started using the mark. Edgerton maintains "it would be unjust and inequitable to permit [Boss Products] to strip [Edgerton] of its use of a name that [Edgerton] built up on its own sweat equity, hard work and extensive marketing over many years." Edgerton asks the court to find that the thirty-year delay in attempting to enforce trademark rights is unreasonable, prejudicial, and inequitable and a bar to Boss Products' claims for relief.

"[A]cquiescence refers to cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another. . . . More generally, acquiescence is related to the doctrine of laches, by which equity comes to the aid of an innocent user and grants him refuge from a claimant who has calmly folded his hands and remained silent while the innocent user has exploited and strengthened his mark." TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d

876, 885 (7th Cir. 1997) (internal quotation omitted). To succeed on an acquiescence defense, Edgerton must show that Nelson's actively represented that it wouldn't assert its trademark rights; the delay between that representation and the bringing of suit wasn't excusable; and the delay caused Edgerton undue prejudice. Profitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy, P.C., 314 F.3d 62, 67 (2d Cir. 2002). Edgerton, though, maintains Nelson's never addressed the issue of its trademark rights or Edgerton's use of the "Port-A-Pit" mark in the parties' dealings, so Edgerton can't establish Nelson's "active representation" that it wouldn't assert its trademark rights and can't prevail on an acquiescence defense.

In contrast, laches implies a "merely passive consent" to use of a trademark. Profitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy, P.C., 314 F.3d 62, 67 (2d Cir. 2002). "The application of laches . . . is dependent upon a showing of an unreasonable lack of diligence by the party against whom the defense is asserted and prejudice arising from this lack of diligence." Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 822 (7th Cir. 1999). The laches doctrine requires Edgerton to establish that Nelson's had knowledge of Edgerton's use of the mark, Nelson's inexcusably delayed taking action with respect to Edgerton's use of the mark, and Edgerton would be prejudiced by allowing Nelson's to asserts its rights at this time. Chattanoga Mfg., Inc. v. Nike, Inc., 301 F.3d 789, 792-793 (7th Cir. 2002); *see also* Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 924 (7th Cir. 1999) ("In addition to showing unreasonable

delay, a party seeking to avail itself of the equitable defense of the doctrine of laches must also show that the party has been prejudiced by the plaintiff's unreasonable delay in pursuing its cause of action."). A laches defense "does not divest the trademark owner of the right to use the mark but may deprive him or her of any remedy for infringing uses by others." <u>TMT North America, Inc. v. Magic Touch GmbH</u>, 124 F.3d 876, 885 (7th Cir. 1997) (internal quotation omitted).

*a. Knowledge* – The record establishes that Nelson's knew of Edgerton's use of the "Port-A-Pit" mark beginning in the 1970's. The 1974 and 1975 contracts were signed by Robert Peverly, on behalf of "Port-A-Pit Bar-B-Que of Edgerton" and the 1983 and 1987 agreements were signed by Robert Peverly on behalf of "Port-A-Pit Bar-B-Que of Edgerton, Inc."[6]

*b. Inexcusable Delay* – The Lanham Act contains no statute of limitations, so courts must look to the analogous state statute of limitations to determine whether a presumption of laches should apply. "Once the relevant state limitations period has run, an allegedly infringing party is entitled to a presumption that the doctrine of laches applies." <u>Wisconsin Cheese Group, Inc. v. V&V Supremo Foods, Inc.</u>, 537 F. Supp. 2d 994, 1000 (W.D. Wis. 2008); *see also* <u>Argus Research Group, Inc. v. Argue Media, Inc.</u>, 562 F. Supp. 2d 260, 272 (D.Conn. 2008) ("if suit is brought outside the statute of limitations, the delay is

---

[6] Boss Products claims Edgerton didn't infringe the "Port-A-Pit" mark until 2003: "the oral agreement between [Nelson's] and [Edgerton] allowing [Edgerton] to use the mark effectively constituted an oral trademark license [so] no infringement occurred until after 2003 when Boss demanded that [Edgerton] stop using the "Port-A-Pit" mark." The court can't agree. As already discussed, the written terms of the contracts govern.

presumptively unreasonable; if suit is brought within that period, the delay is presumptively reasonable"). Indiana's most analogous state statute is the Deceptive Consumer Sales Act, IND. CODE § 24-5-0.5-1 *et seq.*, which includes a two-year statute of limitations. IND. CODE § 24-5-0.5-5(b); *see also* <u>Chattanoga Mfg., Inc. v. Nike, Inc.</u>, 301 F.3d 789, 793 (7th Cir. 2002) (applying limitation period found in Illinois Consumer Fraud and Deceptive Business Practices Act); <u>Wisconsin Cheese Group, Inc. v. V&V Supremo Foods, Inc.</u>, 537 F. Supp. 2d 994, 1000 (W.D. Wis. 2008) (using limitation period in Wisconsin Deceptive Trade Practices Act).

Over the thirty years in which Edgerton used the "Port-A-Pit" mark, the parties entered into four written contracts and various written addendums to those contracts, with no mention of Nelson's trademark rights or restrictions on use of the mark. Even if Boss Products believed that an oral agreement governed Edgerton's use of the "Port-A-Pit" mark, the evidence establishes that Boss Products had knowledge in 2000 – five years before filing suit – that Edgerton wasn't using Nelson's sauces, a requirement Boss Products saw as vital to non-infringing use of the mark. Boss Products' claims were filed well outside the two-year statute of limitations, and the record supports a finding that the company inexcusably delayed taking action with respect to Edgerton's use of the "Port-A-Pit" mark.

*c. Prejudice* – Edgerton maintains that it detrimentally and reasonably relied on Nelson's failure to act. Edgerton explains that Robert Peverly and his wife built

17

a very successful catering business and established goodwill in thirty-two Ohio counties and three Indiana counties using the "Port-A-Pit" name. The Peverlys say that over the years they developed their own processes for preparing and cooking chicken, located their own vendors for supplies, decided what side dishes to make available, and operated their business independent from assistance and guidance from Nelson's. Edgerton concludes that it would be unjust to permit Boss Products to effectively rob Edgerton of its own goodwill.

Troy Gongwer's claim that Nelson's conducted business under the "Port-A-Pit" name before 1974 in areas eventually assigned to Edgerton, doesn't rebut Edgerton's claim that the Peverlys established the success of the "Port-A-Pit" business in Edgerton's territory of operation and that their inability to continue operating their business under the "Port-A-Pit" name would strip them of the goodwill they spent thirty years establishing. *See* <u>Wisconsin Cheese Group, Inc. v. V&V Supremo Foods, Inc.</u>, 537 F. Supp. 2d 994, 1004 (W.D. Wis. 2008) ("Economic prejudice exists when a trademark owner's delay caused the alleged infringer to build up a valuable business around its trademark in a way that would not have happened if the trademark owner had asserted its rights promptly.").

*d. Relief* – "The doctrine of laches bars a plaintiff from recovering damages or wrongfully derived profits during the time prior to filing a suit, but it is not an automatic bar to injunctive relief in trademark actions. In some cases, however, the delay may be so prolonged and inexcusable that it would be inequitable to

permit the plaintiff to seek injunctive relief as to future activities." <u>Wisconsin Cheese Group, Inc. v. V&V Supremo Foods, Inc.</u>, 537 F. Supp. 2d 994, 1005 (W.D. Wis. 2008) (internal quotation and citations omitted). The delay in this case – thirty years at the long-end and five years at the short-end – amounts to an extreme delay and would cause substantial prejudice to Edgerton should Edgerton be forced to rebuild its business under a new name, unknown in its area of operation. Edgerton's request for summary judgment on Boss Products' trademark claims and requests for relief on those claims must be granted.

## III. BREACH OF CONTRACT CLAIM

Boss Products alleges in Count 1 of its complaint that Edgerton breached paragraph 13(f) of the 1983 and 1987 Lease Agreements, which provides that

> Lessee agrees not to copy or duplicate the leased machine either directly or indirectly, nor to aid anyone else in copying same. If Lessee should violate this subparagraph it shall constitute a basis for default of the lease but if Lessor does not elect to so treat it Lessor shall nevertheless be entitled to attorneys fees incurred in suit for damages or injunction to enforce this subparagraph.

Boss Products claims Edgerton breached this covenant when it acquired a barbeque grill "manufactured to exhibit the cater-car's features."

Edgerton seeks summary judgment on the breach of contract claim based on its assertion that it didn't copy or duplicate the Cater-Car grill and so didn't breach the contracts. According to Edgerton, Robert Peverly "wanted a better grill and took one of the leased units to a fabricator, [who] examined the leased Cater-

Car Grill and then built a new, different and better machine." Mr. Peverly explains that in meeting with the fabricator, he "spent considerable time explaining what [he] wanted and went over numerous aspects that [he] wanted done differently on the grill [he] had built." Mr. Peverly says he didn't request the fabricator to copy or duplicate the Cater-Car grill.

Relying on dictionary definitions of "copy" (to "make an *identical* version of") and "duplicate" (to "make an *exact* copy of"), Edgerton insists use of those terms in the lease agreements can't be interpreted as barring its acquisition of a grill that is "similar" to the Cater-Car grill. Edgerton lists twenty differences between its new grill and the Cater-Car grill — differences the company says affect not only the appearance of the grill, but its functionality. Edgerton concludes that with those differences, the new grill isn't an identical or exact copy of the Cater-Car grill and, therefore, there was no breach of the 1983 or 1987 lease agreements.

Boss Products responds that summary judgment should be denied for three reasons. First, Boss Products says Edgerton's interpretation of paragraph 13(f) ignores inclusion of the terms "indirectly" and "aid" in that paragraph: the language of paragraph 13(f) "prevents not only the indirect copying and duplication of a machine, but also prevents [Edgerton] from aiding 'anyone else' in copying the same." Boss Products claims this paragraph seeks to prevent its machine from being used in the production of like machines. Boss Products next claims Robert Peverly hasn't given the "full story" about his motivations for taking the Cater-Car grill to a fabricator and his deposition testimony and affidavit

20

statements relating to those reasons sufficiently conflict so as to call his credibility into question. Boss Products lastly argues that even though Edgerton lists twenty differences between its grill and the Cater-Car, the new grill incorporates the Cater-Car's essential components: Edgerton's referenced differences are merely "bells and whistles" and no difference exists between the essential interior components of the two grills, leaving questions of fact as to whether the new grill is a copy or duplicate of the Cater-Car.

While the court can't agree that the language of paragraph 13(f) "clearly" prohibits the making of a like-machine or that Robert Peverly's deposition and affidavit statements about his contacts with the fabricator are in conflict, the court agrees that a question of fact exists as to whether Edgerton's new grill constitutes a "copy" or "duplicate" of the Cater-Car grill. Summary judgment on the breach of contract claim will be denied.


IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part the defendant's summary judgment motion [docket # 30] as follows:

(1) the motion is GRANTED on Edgerton's request for judgment on Boss Products' trademark claims contained in Counts II-IV of the complaint; and

(2) the motion is DENIED on Edgerton's request for judgment on Boss Products' breach of contract claim.

The case remains at issue on Count I of the complaint and the claims of the defendant's counterclaim. A conference will be scheduled under separate order to set a trial date.

SO ORDERED.

ENTERED:   February 4, 2009   

   /s/ Robert L. Miller, Jr.               
Chief Judge
United States District Court